# In the United States Court of Federal Claims

No. 18-295V
(Filed Under Seal: September 11, 2024)
(Reissued: October 1, 2024)*
**FOR PUBLICATION**

*************************************
KEVIN SPARROW and DANIELLE       *
SPARROW, parents and natural     *
guardians, on behalf of L.S.,    *
                                 *
              Petitioners,    *
                                 *
v.                               *
                                 *
SECRETARY OF HEALTH AND          *
HUMAN SERVICES,                  *
                                 *
              Defendant.      *
                                 *
*************************************

*Scott B. Taylor*, Urban & Taylor, S.C., Milwaukee, WI, for Petitioner.

*Rachelle P. Bishop*, Trial Attorney, Torts Branch, Civil Division, United States Department of Justice, Washington, D.C., for Respondent. With her on briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *C. Salvatore D'Alessio*, Director, *Heather L. Pearlman*, Deputy Director, *Lara A. Englund*, Assistant Director, and *Naseem Kourosh*, Trial Attorney, Torts Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

Petitioners Kevin and Danielle Sparrow sought relief under the National Vaccine Injury Compensation Program, 42 U.S.C. §§ 300aa-10 to 34 ("Vaccine Act"), on behalf of their minor daughter L.S., who developed serious neurological conditions after receiving a measles, mumps, and rubella vaccine.

The Special Master found that Petitioners had not carried their burden to prove causation and denied recovery. *See* Entitlement Decision (ECF 124).

---

* This Opinion was issued under seal on September 11, 2024. The parties were directed to propose redactions by September 25, 2024. No proposed redactions were submitted. The Court hereby releases publicly the Opinion and Order of September 11 in full.

Petitioners filed a motion for review, which has been fully briefed and argued.[1] The Special Master's decision was not arbitrary and capricious, so the motion for review is **DENIED**.[2]

## BACKGROUND

To obtain compensation under the Vaccine Act, a petitioner must prove that a vaccine caused an injury.[3] *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005); *see also Lombardi v. Sec'y of Health & Hum. Servs.*, 656 F.3d 1343, 1353 (Fed. Cir. 2011) ("[T]he statute places the burden on the petitioner to make a showing of at least one defined and recognized injury."). There are two ways to show that a vaccine caused a given medical condition: (1) "through a statutorily-prescribed presumption of causation upon a showing that the injury falls under the Vaccine Injury Table ('Table injury')," *Althen*, 418 F.3d at 1278 (citing 42 U.S.C. § 300aa-14(a)), or (2) by establishing causation in fact "where the complained-of injury is not listed in the Vaccine Injury Table ('off-Table injury')." *Id.* (citing 42 U.S.C. §§ 300aa-13(a)(1), 300aa-11(c)(1)(C)(ii)(I)). In an off-Table case — like this one[4] — a petitioner must prove causation by a preponderance of the evidence. *See, e.g., id.*; *Hibbard v. Sec'y of Health & Hum. Servs.*, 698 F.3d 1355, 1366 (Fed. Cir. 2012).

The first prerequisite of proving causation in an off-Table case is to identify the injury. *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1346, 1349 (Fed. Cir. 2010) (citing 42 U.S.C. § 300aa–11(c)(1)(C)(ii)(I)); *Lasnetski v. Sec'y of Health & Hum. Servs.*, 696 F. App'x 497, 503–04 (Fed. Cir. 2017); *Lombardi*, 656 F.3d at 1353; *see also Andreu ex rel. Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1382 (Fed. Cir. 2009) (explaining that "the function of a special master is not to 'diagnose' vaccine-related injuries, but instead to determine based on the record evidence as a whole and the totality of the case, whether it has been shown by a preponderance of the evidence that a vaccine caused the [petitioner's] injury") (quotes omitted).

---

[1] Petitioners' Mot. for Review (ECF 126); Petitioners' Mem. of Objections ("Pets.' Mem.") (ECF 128); Respondent's Mem. in Resp. to Petitioners' Mot. for Review ("Resp't's Br.") (ECF 131).

[2] This Court has jurisdiction. *See* 42 U.S.C. §§ 300aa-11(a), 300aa-16(a). Petitioners timely moved for review. *See* 42 U.S.C. § 300aa-12(e)(1).

[3] Many Vaccine Act decisions address situations where the petitioner was himself the injured party. Although that is not the case here, for the sake of clarity I will treat the petitioner and the injured party as one and the same for purposes of laying out the applicable law.

[4] As discussed below, the exact characterization of L.S.'s injury is in dispute, but the parties agree that it is not covered by the Table. The Table lists encephalopathy and encephalitis — possible ways of describing L.S.'s condition — for measles, mumps, and rubella vaccines, but only when they appear between five and fifteen days after vaccine administration. 42 U.S.C. § 300aa-14(a); 42 C.F.R. § 100.3(a)(III). The record shows that L.S.'s injury developed later. Entitlement Decision at 2–3.

Sometimes that is straightforward and requires no special discussion: In many cases, the petitioner and government define the injury in the same way. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1357 (Fed. Cir. 2013); *Contreras v. Sec'y of Health & Hum. Servs.*, 844 F.3d 1363, 1368 (Fed. Cir. 2017); *see also Germaine v. Sec'y of Health & Hum. Servs.*, 155 Fed. Cl. 226, 227 (2021); *Bello v. Sec'y of Health & Hum. Servs.*, 167 Fed. Cl. 517, 519 (2023).[5] Or they might agree on the general nature of the injury, even if they differ on which of its particular variations the petitioner exhibits. *Broekelschen*, 618 F.3d at 1346 (distinguishing *Andreu*, 569 F.3d at 1378, 1381, and *Kelley v. Sec'y of Health & Human Servs.*, 68 Fed. Cl. 84, 100–01 (2005)).

In other cases, though, the parties describe the petitioner's condition in terms of competing alternatives with similar symptoms but different "underlying causes or etiology." *See, e.g., Broekelschen*, 618 F.3d at 1346. In that circumstance — when "the injury itself is in dispute, the proposed injuries differ significantly in their pathology, and the question of causation turns on which injury [petitioner] suffered," *id.* — the court must "first find which of [the proposed explanations is] best supported by the evidence presented in the record," then "subsequently determine causation relative to the injury." *Id.* In other words, when a Vaccine Act claim's premises involve disputed etiological questions, those questions are properly resolved before other aspects of causation.[6] *See Simanski v. Sec'y of Health & Hum. Servs.*, 115 Fed. Cl. 407, 440 (2014).

Identifying the injury can essentially dispose of the causation question: if, for example, the petitioner fails to present evidence that the condition he has could have been caused by the vaccine he received. *Hibbard*, 698 F.3d at 1365 (noting that in *Broekelschen* and *Lombardi*, "the special master's findings on the nature of the injury that the petitioner incurred were sufficient to resolve the case because the special master found that the injury the petitioner incurred was not one that could have been

---

[5] Even then, the petitioner must show that he meets diagnostic criteria for his purported injury. *Hibbard*, 698 F.3d at 1366–67.

[6] The point of the *Broekelschen* and *Hibbard* injury-identification inquiries is that the petitioner must "show that he actually has whatever condition he claims the vaccine caused" before considering causation. *See White v. Sec'y of Health & Hum. Servs.*, 168 Fed. Cl. 531, 532 (2023) (citing *Hibbard*, 698 F.3d at 1364–65, and *Broekelschen*, 618 F.3d at 1346). That has the benefit of logic: Even if questions of injury-identification and causation overlap, there is no meaningful way to analyze causation without defining the injury. Suppose a patient died on the way home from receiving a vaccine. There would be no point in simply asking whether a given vaccine could cause death: This Court would need to know if the record indicated that the patient died of a heart attack or in a car accident. By extension, if the former, the Court would also need to decide if the heart attack was caused by inflammation or cholesterol blockage. Thus, a preliminary injury-identification question comports with the test for causation, which demands a linkage between the vaccine and "*the injury*." *Althen*, 418 F.3d at 1278 (emphasis added); *see Broekelschen*, 618 F.3d at 1346.

vaccine-induced according to the petitioner's medical theory"). More often, though, once the injury has been identified, special masters proceed to analyze whether the vaccine caused the identified injury based on the test set out in *Althen*. *Lombardi*, 656 F.3d at 1352 ("[I]dentification of a petitioner's injury is a prerequisite to an *Althen* analysis of causation.").

Under *Althen*, causation of off-Table injuries has three elements: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Althen*, 418 F.3d at 1278.[7] Although the petitioner's burden to prove causation does not "require identification and proof of specific biological mechanisms," *Knudsen by Knudsen v. Sec'y of Dep't of Health & Hum. Servs.*, 35 F.3d 543, 549 (Fed. Cir. 1994), "a 'plausible' or 'possible' causal theory" is not enough, *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1360 (Fed. Cir. 2019) (quoting *Moberly ex rel. Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1322 (Fed. Cir. 2010)). Proof of causation requires "a reputable medical or scientific explanation that pertains specifically to the petitioner's case[.]" *Broekelschen*, 618 F.3d at 1345; *Moberly*, 592 F.3d at 1322; *see also Knudsen*, 35 F.3d at 549 ("[C]ausation can be found in vaccine cases based on epidemiological evidence and the clinical picture regarding the particular [patient] without detailed medical and scientific exposition on the biological mechanisms.").

A theory of causation must be supported by medical records or an expert's opinion. *Althen*, 418 F.3d at 1279 (citing 42 U.S.C. § 300aa-13(a)(1)). Although the Federal Rules of Evidence do not control in Vaccine Act cases, *Hines ex rel. Sevier v. Sec'y of Dep't of Health & Hum. Servs.*, 940 F.2d 1518, 1525 (Fed. Cir. 1991) (citing 42 U.S.C. § 300aa–12(d)(2)), the Federal Circuit permits special masters to evaluate the weight and credibility of expert opinions using the Supreme Court's *Daubert* factors. *Boatmon*, 941 F.3d at 1359 (Fed. Cir. 2019) (citing *Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1338–39 (Fed. Cir. 2010), and *Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1316 (Fed. Cir. 1999)); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–96 (1993).

This Court may set aside a special master's conclusions as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa-12(e)(2)(B). "Fact findings are reviewed … under the arbitrary and capricious

---

[7] The government can rebut proof of causation by showing, "also by a preponderance of evidence, that the injury was in fact caused by factors unrelated to the vaccine." *Althen*, 418 F.3d at 1278 (quoting *Knudsen by Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 547 (Fed. Cir. 1994)); *see* 42 U.S.C § 300aa-13(a)(1)(B).

standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard." *Munn v. Sec'y of Dep't of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992). When this Court finds error, it may either substitute its own findings and conclusions or remand for additional proceedings. 42 U.S.C. § 300aa-12(e)(2)(B)–(C). But when "the special master's findings of fact are supported by substantial evidence," they must be upheld. *Doe ex rel. Doe v. Sec'y of Health & Hum. Servs.*, 601 F.3d 1349, 1355 (Fed. Cir. 2010). That standard — which includes special masters' interpretations of expert opinion — is "well understood to be the most deferential possible." *Munn*, 970 F.2d at 870.

## DISCUSSION

The parties appear to agree that around three weeks after the measles, mumps, and rubella vaccine was administered, L.S. suffered from encephalitis, and that she ultimately satisfied the diagnostic criteria for an autoimmune condition called acute demyelinating encephalomyelitis ("ADEM"). Entitlement Decision at 15–16, 19, 24; Pets.' Mem. at 9, 14; Resp't's Br. at 7 n.5. The main question is whether Petitioners have borne their burden to prove that the injury resulted from the vaccine. The Special Master concluded that they did not, reasoning that (1) L.S.'s encephalitis was viral rather than autoimmune in origin, Entitlement Decision at 24, and in any event (2) Petitioners had failed to prove a medical theory of causation under *Althen*.[8] *Id.* at 24–42. I conclude that the Special Master's decision was not arbitrary and capricious.

### I. Characterization of the Injury

As explained above, the first step of analyzing Petitioners' claims — before reaching the *Althen* causation test — is to identify L.S.'s injury. *Broekelschen*, 618 F.3d 1346; *Lombardi*, 656 F.3d at 1353. Her first medical condition was encephalitis, an umbrella term for brain inflammation, whatever the cause might be. Entitlement Decision at 18–19; *see Broekelschen*, 618 F.3d at 1347 (noting that alternative characterizations of the petitioner's condition could all be covered by the term "myelopathy"). If that was L.S.'s injury, the Special Master was obligated to begin by determining what kind of encephalitis L.S. experienced. Petitioners argue that L.S.'s encephalitis was always best explained as ADEM caused by the vaccine she received. Pets.' Mem. at 14. The government disagreed, arguing that L.S.'s encephalitis was initially caused by a viral infection and only later developed into ADEM. *See* Resp't's

---

[8] The Special Master stated that "[b]ecause the evidence preponderates in favor of this finding, allocating a burden of proof is not required. If the burden of proof were on the Secretary, the Secretary has met his burden." Entitlement Decision at 24 n.13. Nonetheless, the Special Master correctly identified elsewhere that the burden in this case was on the Petitioners, not the Secretary. *Id.* at 18, 42.

Br. at 6–8.[9] Autoimmune and infectious encephalitis have "overlapping symptoms," but their "underlying causes or etiology are completely different." *See Broekelschen*, 618 F.3d at 1346; Entitlement Decision at 18–19. The Special Master agreed with the government. Entitlement Decision at 24. That decision is supported by substantial evidence.

At the threshold, the parties appear to agree that L.S. actually had a viral infection. The Special Master cited various aspects of L.S.'s symptoms and medical tests — neck pain, a fever that did not respond to medication, her heart rate and blood pressure, results of blood counts and spinal taps — suggesting that L.S.'s encephalitis had an infectious cause. *See id.* at 20–22. The Special Master also found that the parties' experts agreed that viral encephalitis could lead to ADEM, thus explaining the progression of L.S.'s condition. *Id.* at 24. Petitioners have not briefed any argument that the Special Master was wrong to characterize those facts as he did, and in fact they seem to assume that L.S. had an infection. *See* Pets.' Mem. at 12–13. I therefore likewise assume that L.S. had a viral infection when her symptoms developed.

Petitioners instead argue that the presence of an unspecified virus is not enough to prove that the virus caused L.S.'s encephalitis. *See* Pets.' Mem. at 13–14. That is true so far as it goes — obviously the observed presence of a pathogen does not explain everything that might be wrong with a person, *see Knudsen*, 35 F.3d at 549–50[10] — but it is a straw man in this case, where the Special Master inferred viral causation from the observations of medical professionals charged with L.S.'s care. Not only is characterizing injuries and inferring causation based on symptoms and test results completely normal in Vaccine Act cases, it is what special masters are *required* to do. *See, e.g., Moberly*, 592 F.3d at 1323; *James-Cornelius ex rel. E.J. v. Sec'y of Health and Hum. Servs.*, 984 F.3d 1374, 1379–80 (Fed. Cir. 2021); *Faup v. Sec'y of Health & Hum. Servs.*, 147 Fed. Cl. 445, 465 (2019); *Raybuck v. Sec'y of Dep't*

---

[9] The parties have not addressed how to define an "injury" when one medical condition may have developed into another, *e.g.*, if an infection leads to inflammation which leads to an autoimmune disorder such as ADEM. But the issue does not matter for present purposes. If the injury was encephalitis or ADEM, it was proper for the Special Master to identify either condition's etiology. *Broekelschen*, 618 F.3d at 1346. If the government characterized the injury as infection or encephalitis and Petitioners characterized it as ADEM, the Special Master was obligated to resolve the dispute before going further. *Id.* Either way, this case involved a dispute about the nature of the injury that had to precede the *Althen* analysis.

[10] Petitioners rely on *Knudsen* for the proposition that "evidence that a child has a viral infection does not establish that the child suffered a viral encephalitis." Pets.' Mem. at 13–14. *Knudsen* establishes that in Table cases — where injuries are presumed to be caused by the relevant vaccine — the government cannot rebut causation merely by pointing to the presence of a virus. *Knudsen*, 35 F.3d at 549–50. That is irrelevant to Petitioners' broader argument that the Special Master could not infer viral causation from symptoms and test results consistent with a viral infection.

*of Health & Hum. Servs.*, 98 Fed. Cl. 713, 718 (2011); *Morris v. Sec'y of Dep't of Health & Hum. Servs.*, 57 Fed. Cl. 383, 389–90 (2003); *see generally Hart v. Sec'y of Dep't of Health & Hum. Servs.*, 60 Fed. Cl. 598 (2004) (vacating and remanding decision of special master who rejected compensation based on statistical probabilities rather than analysis of the patient's symptoms). Nor have Petitioners pointed to any error in the Special Master's observation that because not all viruses have been identified, special masters can infer viral causation without specifying a particular virus. Entitlement Decision at 23 (citing *Knudsen*, 35 F.3d at 549, *Raybuck*, 98 Fed. Cl. at 718–19, and *Morris*, 57 Fed. Cl. at 389–90). A special master may characterize an inflammation as viral when its characteristics are more consistent with an infection than an autoimmune reaction.

Relatedly, Petitioners argue that the Special Master erred in making inferences about the causes of L.S.'s condition based on medical observations that took place later — specifically, when she was hospitalized several days after her symptoms developed. Pets.' Mem. at 11–12. There is nothing unusual about that inference either: Of course medical tests will generally come after symptoms first develop. Petitioners cite nothing in the record establishing that it was arbitrary and capricious for the Special Master to consider the tests temporally close enough to the onset of symptoms to be probative as to what first caused L.S.'s condition. Exactly how probative the test results were thus goes to the weight of the evidence, which was in the Special Master's purview. *See, e.g., Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1368 (Fed. Cir. 2000).

The same is true for other aspects of the record. Petitioners point to a change in position by the government's expert, Pets.' Mem. at 9–10, but the Special Master acknowledged the issue and decided it did not discredit the expert's testimony, Entitlement Decision at 19 n.10. Petitioners also disagree with the Special Master's decision not to credit their expert, Pets.' Mem. at 11–12, but the Special Master's finding — that the expert exaggerated L.S.'s response to a particular treatment and therefore was not credible about the characterization of her condition, Entitlement Decision at 20 — even if debatable, was a legally permissible inference supported by substantial evidence. *See Broekelschen*, 618 F.3d at 1347 ("[T]he special master's credibility findings 'are virtually unchallengeable on appeal.'") (quoting *Lampe*, 219 F.3d at 1362).[11] Although Petitioners disagree with the Special Master's approach to those issues, they have not developed any argument that it was arbitrary or

---

[11] At argument, Petitioners raised new arguments about their expert's testimony concerning the significance of L.S.'s clinical test results and the course of her treatment. I do not reach those issues because they were not presented in the motion for review. *See* RCFC App. B., R. 24(b).

capricious. That leaves no basis for disturbing the Special Master's characterization of L.S.'s injury.

## II. The *Althen* Causation Factors

If the Special Master was correct that L.S.'s injury was a viral infection that later turned into ADEM, that is the end of the matter: Petitioners have not argued that the vaccine could have caused L.S.'s infection. *See Hibbard*, 698 F.3d at 1365 (noting that "the special master's findings on the nature of the injury … [are] sufficient to resolve [a] case [when] the injury the petitioner incurred was not one that could have been vaccine-induced according to the petitioner's medical theory") (citing *Locane v. Sec'y of Health & Hum. Servs.*, 685 F.3d 1375 (Fed. Cir. 2012), *Lombardi*, 656 F.3d 1343, and *Broekelschen*, 618 F.3d 1339). In the alternative, though, the Special Master also found that even if Petitioners reached the *Althen* causation analysis,[12] Petitioners had failed to prove their case. Entitlement Decision at 26.

As to *Althen* prong one, Petitioners argued a medical theory of "molecular mimicry" to causally connect the vaccine to L.S.'s injury. *Id.* at 26–32; *see Althen*, 418 F.3d at 1278. In simple terms, the vaccine targets proteins in the measles and rubella viruses that bear a chemical resemblance to human proteins that naturally occur in the central nervous system. The molecular mimicry theory posits that the body's immune response to the vaccine creates a risk of an immune response against the similar proteins in the nervous system, leading to ADEM. Entitlement Decision at 34. The Special Master disagreed. *Id.* at 42. Petitioners allege three errors: first, that the Special Master impermissibly required them to submit peer-reviewed literature; second, that the Special Master impermissibly required Petitioners to prove that their theory was widely accepted in the medical community; and third, that the Special Master's conclusion that Petitioners' theory is not widely accepted in the medical community was arbitrary and capricious. Pets.' Mem. at 14–19. All three arguments fail.

The Supreme Court in *Daubert* listed various factors relevant to the admissibility of expert testimony, including whether the expert's theory has been published and peer reviewed, and whether it has been widely accepted in the relevant expert community.[13] *Daubert*, 509 U.S. at 593. Neither *Daubert* nor the Federal Rules of Evidence control admission of expert testimony in Vaccine Act cases, *Boatmon*, 941

---

[12] An *Althen* analysis might be required if, for example, the Special Master erred in concluding that L.S.'s encephalitis was caused by a virus, or if L.S.'s injury should have been characterized as ADEM — her ultimate condition — as a matter of law.

[13] Admissibility is now governed by Federal Rule of Evidence 702.

F.3d at 1359; *Cedillo*, 617 F.3d at 1342, and special masters cannot require petitioners to provide peer-reviewed literature or prove wide acceptance of their theories. *See Althen*, 418 F.3d at 1279–81; *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1325 (Fed. Cir. 2006). But special masters *may* — as mentioned above — use the *Daubert* factors to evaluate experts' credibility. *Cedillo*, 617 F.3d at 1338–39; *Boatmon*, 941 F.3d at 1359. That is exactly what the Special Master did here: He noted that *Daubert* provides "a non-exclusive set of factors trial courts could use to assess the reliability of an expert's opinion," and he found that those factors counseled against crediting Petitioners' expert. Entitlement Decision at 41–42. Nothing in the Special Master's opinion suggests that he *required* peer-reviewed literature or widespread acceptance. *See id.* at 30–31. Instead, he properly applied the *Daubert* factors to find that Petitioners' expert's medical theory was not credible. *See id.* at 42. I see no legal error.

The Special Master observed that the lack of peer-reviewed literature suggests that the Petitioners' causation theory is not widely accepted, Entitlement Decision at 42, which is an entirely permissible inference. *See Daubert*, 509 U.S. at 593. Petitioners do not dispute that their medical theory is undocumented in peer-reviewed studies, so they have given me no reason to disturb the Special Master's credibility findings in that regard.

Petitioners do argue that the Special Master erred in concluding that it is not widely accepted that a measles, mumps, and rubella vaccine can cause "neurologic injuries." Pets.' Mem. at 18–19; Entitlement Decision at 42. But beyond suggesting that some evidence on the record may contradict the Special Master's overall conclusion,[14] Petitioners' argument does not address the specifics of the Special Master's reasoning. At most, Petitioners point out that "encephalopathy" and "encephalitis" — which presumably count as neurologic injuries — are Table injuries when they appear five to fifteen days after a measles, mumps, and rubella vaccine like L.S.'s. 42 U.S.C. § 300aa-14(a)(II)(2); 42 C.F.R. § 100.3(a)(III)(B). But as the

---

[14] Petitioners point, for example, to two published studies, to what they take to be the views of L.S.'s treating physicians, and to Petitioners' expert's own view. Pets.' Mem. at 18–19. Even if some published studies did support Petitioners' theory, the Special Master found that "the epidemiologic evidence tends to undermine the claim that [a measles, mumps, and rubella] vaccine can cause ADEM." Entitlement Decision at 30. Cherry-picking favorable evidence is not enough to challenge that conclusion. As for the treating physicians, "while it often makes sense to defer to a treating physician's knowledge of a patient's physical condition," that deference does not extend to the physician's broader views on defining diseases and identifying their causes. *See White*, 168 Fed. Cl. at 533. And as for the expert's view, Petitioners' argument — that their expert's "opinion that the [measles, mumps, and rubella] vaccine can cause neurologic injury … demonstrates that the idea that [the measles, mumps, and rubella] vaccine can cause neurologic injury is widely accepted" — is circular and self-referential, and so carries no weight. Pets.' Mem. at 19; *cf. Bradley ex rel. AJW v. Ackal*, 954 F.3d 216, 230 (5th Cir. 2020).

Federal Circuit has explained, "[s]imple similarity to conditions or time periods listed in the Table is not sufficient evidence of causation" in off-Table cases. *Grant v. Sec'y of Dep't of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992) (quoting H.R. Rep. No. 99-908, 2d Sess., pt. 1, at 15 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6344, 6356). Besides, the Table lists ADEM among the "exclusionary criteria" for encephalitis, 42 C.F.R. § 100.3(c)(3)(ii)(C), implying that even if the Table does link some neurologic conditions to the vaccine, ADEM is not among them. The Table therefore does not support Petitioners' proposed connection between the vaccine and autoimmune neurological disorders.

As to *Althen* prong two, Petitioners argue that the Special Master erroneously discounted the opinions of L.S.'s treating physicians in determining that Petitioners had not proven "a logical sequence of cause and effect." *Althen*, 418 F.3d at 1278; *see* Pets.' Mem. at 19–21. For example, Petitioners claim that L.S.'s treating physicians "express[ed] unequivocal opinions" that L.S. had ADEM. Pets.' Mem. at 19.

But even if that is true, it does not matter: The parties agree that L.S. ultimately developed ADEM, but disagree about how she got there. Her physicians only expressed their "unequivocal opinions" that L.S.'s condition was ADEM after the date at which the Special Master found that L.S.'s infection had ended and her autoimmune condition had appeared. *See* Entitlement Decision at 24; *see also* Pets.' Ex. 2 at 2928, 4559 (ECF 1-4); Hr'g Tr. at 256 (ECF 110). Agreement that L.S. developed ADEM, in other words, does not undermine the Special Master's conclusion that her ADEM resulted from an infection.

The Special Master interpreted the treating physicians' opinions as more uncertain when L.S.'s symptoms developed, as they did not explicitly point to an autoimmune response at the time. *See* Entitlement Decision at 43–46. Although one of L.S.'s doctors suggested that her ADEM may have resulted from a vaccine reaction, Pets.' Ex. 2 at 3985–86, others said an infectious cause was possible as well and that attribution to the vaccine was unlikely, *id.* at 368, 395, 543, 580. The Special Master's view that the treating physicians did not unambiguously point to an autoimmune explanation was therefore supported by substantial evidence, and is consistent with his conclusion that L.S. experienced viral encephalitis before developing ADEM. *See Waleryszak v. Sec'y of Dept. of Health and Hum. Servs*, 45 Fed. Cl. 573, 577–78 (1999).

## **CONCLUSION**

For the foregoing reasons, Petitioners' motion for review is **DENIED**. The decision of the Special Master is **SUSTAINED**.

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED**.

s/ Stephen S. Schwartz
STEPHEN S. SCHWARTZ
Judge
